IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **Abukar Hassan Ahmed,** | : | Case No. 2:10-cv-342 |
| | : | |
| Plaintiff, | : | JUDGE {------} |
| | : | |
| | : | |
| | : | |
| **Abdi Aden Magan,** | : | |
| | : | |
| Defendant. | : | |

**JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiff Abukar Hassan Ahmed (also known as "Yare") complains and alleges as follows:

**PRELIMINARY STATEMENT**

1. Plaintiff institutes this civil action for compensatory and punitive damages against Defendant Colonel Abdi Aden Magan ("Magan") for his responsibility for the torture, arbitrary detention, and cruel, inhuman or degrading treatment or punishment of Plaintiff.

2. On or about the evening of November 20, 1988, Plaintiff Abukar Hassan Ahmed ("Plaintiff"), a human rights attorney and law professor at Somali National University, was taken into detention at the National Security Service of Somalia ("NSS") Department of Investigations Prison ("NSS Prison"), interrogated and tortured for approximately three months. Plaintiff suffered severe physical and psychological injuries as a result of his detention and torture.

1

3. Plaintiff alleges that Defendant Magan, who now resides in Columbus, Ohio, ordered, conspired with, aided and abetted, or exercised command responsibility over subordinates in the NSS, or persons or groups acting in coordination with the NSS or under their control, to carry out the torture, arbitrary detention and cruel, inhuman or degrading treatment or punishment of Plaintiff. Further, Defendant Magan failed to prevent or punish the violations of international law committed by his subordinates. Accordingly, Plaintiff asserts that Defendant Magan is liable under domestic and international law for his injuries, pain and suffering.

## JURISDICTION AND VENUE

4. Plaintiff alleges that Defendant Magan is liable for acts of torture as defined by customary international law and the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note). Plaintiff further alleges that Defendant Magan is liable for torture, cruel, inhuman or degrading treatment or punishment, and arbitrary detention in violation of customary international law under the Alien Tort Statute, 28 U.S.C. § 1350 (the "Alien Tort Statute"). Accordingly, this Court has jurisdiction over this action based on 28 U.S.C. § 1350 and 28 U.S.C. § 1331.

5. Defendant Magan is a citizen of the Democratic Republic of Somalia ("Somalia") and resides in Columbus, Ohio. Therefore venue is proper in the United States District Court for the Southern District of Ohio, Eastern Division pursuant to 28 U.S.C. § 1391(b)(1) or (d).

## PARTIES

*Defendant*

6. Defendant Magan is a native of Somalia and a permanent resident of the United States. He currently resides in Columbus, Ohio.

7. Defendant Magan is a member of the Marehan sub-clan of the Darod clan, the same sub-clan as Major General Mohamed Siad Barre ("Barre"), who ruled Somalia

2

from 1969 until 1991.  As a member of the favored Marehan sub-clan, Magan was appointed by the Barre military regime to top positions in the NSS.

8.  From approximately 1988 to 1990, Defendant Magan held the rank of Colonel and served as Chief of the NSS Department of Investigations - National Level ("NSS Investigations") at NSS Headquarters in the capital city of Mogadishu, Somalia.

9.  As Chief of NSS Investigations, Defendant Magan directed and participated in the interrogation and torture of Plaintiff and other civilians perceived as opponents of the Barre regime.

*Plaintiff*

10.  Plaintiff is a native of Somalia and a naturalized citizen and resident of the United Kingdom.  He is a member of the Abgaal sub-clan of the Hawiye clan from his father's side and the Shaanshiye sub-clan of the Reer Hamar clan from his mother's side.

11.  Plaintiff is a former practicing attorney and law professor at Somali National University in Mogadishu, where he taught Constitutional Law and International Law courses, which included instruction on human rights protections.  Plaintiff also served as a defense attorney representing accused political dissidents before the National Security Court, a special military court with jurisdiction over Somali civilians accused of national security crimes.

## BACKGROUND

### *Siad Barre Coup and Establishment of the NSS or "Gestapo of Somalia"*

12.  In October 1969, a coup led by Barre, a member of the Marehan sub-clan of the Darod clan, toppled the first and only democratic government of the new nation of Somalia.  Power was assumed by the Supreme Revolutionary Council, which consisted primarily of the Army officers who had supported and participated in the coup.  The Barre regime suspended the existing Constitution, closed the National Assembly, abolished the Supreme Court and declared all political parties illegal.

3

13. In 1970, the Barre regime created the NSS as part of a series of measures designed to suppress and punish opposition to the military government. Responsible for internal security and intelligence, the NSS came to be known as the "Black SS" or "Gestapo of Somalia" because of the torture tactics the NSS employed to extract confessions from detainees. Over the years, the NSS arrested, executed, or imprisoned hundreds, and possibly thousands, of perceived opponents of the military government.

14. The NSS, the Red Berets and the military police known as Hangash were together the Barre regime's principal intelligence gathering agencies (hereinafter "the Security Forces"). The Security Forces, acting in coordination with the Armed Forces, were together responsible for the widespread and systematic use of torture, arbitrary and prolonged detentions, and extrajudicial killings against the civilian population of Somalia.

### *Favoritism of Its Own Clans and Oppression of Other Clans*

15. Even before Somalia became an independent nation, the clan system served as the fundamental building block of Somali society. To further strengthen its grip on power, the Barre regime systematically favored its own clans and oppressed other clans. It appointed members of favored clans to top positions in the Armed Forces and Security Forces, the bureaucracy, and Somali state industries, while it ruthlessly oppressed and targeted other clans. It systematically excluded disfavored clans from positions of power within the government and military and pursued draconian policies intended to weaken them politically and harm them economically.

### *Systematic Attack of Civilians Perceived as Opponents of the Regime*

16. Somalia's defeat in the Ogaden War with Ethiopia from 1977 to 1978 significantly weakened support for the Barre regime. As a result, the Barre regime took increasingly fierce measures against perceived opponents. Beginning in the early 1980s and escalating over the course of the decade, the government committed numerous

4

atrocities against ordinary citizens.  These measures were intended to terrorize the civilian population and deter it from supporting the growing opposition movements.

17.  By early 1988, as a member of Barre's favored Marehan sub-clan, Defendant Magan became Chief of NSS Investigations at NSS Headquarters in Mogadishu and served in that capacity until Barre and his supporters were ousted from power.  Defendant Magan stood at the pinnacle of NSS Investigations, which systematically targeted ordinary citizens perceived as opponents of the Barre regime and subjected them to prolonged arbitrary detention, brutal interrogation, and torture.

### *Hawiye Opposition and the Regime's Massive Crackdown*

18.  By 1989, the Hawiye clan, the most populous group in Mogadishu and surrounding areas, and the clan of which Plaintiff is a member, began supporting the rebel United Somali Congress ("USC") against Barre's regime.  This led to a massive government crackdown in 1989.

19.  On July 13, 1989, the NSS arrested several prominent figures and outspoken critics of the government in Mogadishu and detained them without charge.  In response to these arrests, on July 14, 1989, there were protest demonstrations at many mosques. The Security Forces openly fired on protesters emerging from a mosque in Mogadishu, killing four hundred fifty and seriously injuring two thousand civilians.

20.  The number of those in custody in and around Mogadishu increased dramatically.  The Barre regime arrested and arbitrarily detained civilians based on their clan affiliation and/or perceived opposition to the government.  It is estimated that by mid-1990, there were between seven thousand and ten thousand detainees in Mogadishu from the Isaaq and Hawiye clans.

21.  Throughout 1989 and 1990, the Barre regime's crimes against civilians escalated, gradually leading to withdrawal of American and international support.  By the end of 1990, the Barre regime was in the final stages of complete state collapse.  In early

December 1990, Barre declared a state of emergency, and in January 1991, armed opposition factions finally drove Barre out of power, resulting in the complete collapse of the central government.  When Barre and his supporters were ousted from power, they fled the country.

22. Defendant Magan fled Somalia and, upon information and belief, arrived in the United States in or around the year 2000.

### *Plaintiff Abukar Hassan Ahmed*

23. Plaintiff was a practicing attorney before the Somali courts, as well as a law professor at Somali National University.  He taught Constitutional Law and International Law courses, and his curriculum included the protection of human rights contained in the Somali Constitution.

24. Plaintiff persisted in teaching his students about human rights protections even though members of the NSS were placed amongst his students and colleagues. Plaintiff became outspoken about the Barre regime's attacks on the freedom of expression and widespread abuses of human rights.

### *Plaintiff Becomes a Prisoner of Conscience (1981-1986)*

25. On or about January 21, 1981, after midnight, eight armed officers from the ruling Somali Revolutionary Socialist Party (SRSP) entered Plaintiff's home and took him to the SRSP Prison near Villa Somalia, the Presidential Palace in Mogadishu.  The following morning, Plaintiff was transferred to the NSS Prison at NSS Headquarters in north Mogadishu.

26. Plaintiff was subsequently imprisoned without charge from on or about January 21, 1981 until March of 1986.  Plaintiff was subjected to over five years of arbitrary detention, including solitary confinement for a year and three months.

27. Plaintiff became an Amnesty International ("Amnesty") "prisoner of conscience."  Amnesty campaigned for Plaintiff's release by writing letters on his behalf

6

to the Somali government and Somali diplomatic missions. Amnesty also wrote about Plaintiff's arbitrary detention in its published reports.

28. Finally, on or about March 16, 1986, Plaintiff was released without explanation. After his release, he returned to his position as a law professor at Somali National University, where he continued to teach his students about human rights protections.

29. After his release, Plaintiff also returned to his law practice, where he began defending clients before the National Security Court. His representation of accused political dissidents was known publicly.

## STATEMENT OF FACTS

*Plaintiff is Arbitrarily Detained and Tortured*

30. On or about November 20, 1988, in the evening, three NSS officers approached Plaintiff in the center of Mogadishu.

31. These NSS officers were under the command of Defendant Magan, Chief of NSS Investigations at NSS Headquarters.

32. At the time, Plaintiff was carrying a copy of an Amnesty report. The NSS officers confiscated the Amnesty report that Plaintiff was carrying.

33. The NSS officers placed Plaintiff in handcuffs and transported Plaintiff to the NSS Prison located in the unventilated basement of NSS Headquarters.

34. Plaintiff was held in solitary confinement with continuous artificial lighting. His cell was small and windowless. Plaintiff's left wrist was tightly handcuffed to his right leg for twenty-four hours a day, except during interrogations. He was placed on a starvation diet of rancid bread, butter and tea once a day. He was forced to sleep on cold or wet floors without a mat or blanket. There was no toilet in the cell. He was forced to discharge his urine in empty milk cans. Plaintiff was detained in this manner for approximately three months.

35. Plaintiff was interrogated day and night by two NSS officers under the command of Defendant Magan. Each time, he was taken to a small interrogation room not far from his cell. The NSS officers accused Plaintiff of being a contributing writer to Amnesty. They continually threatened that if he did not confess, they would kill him and no one would know where his body was.

36. On or about February 7, 1989, at night, Plaintiff was taken to Defendant Magan's office at NSS Investigations. Defendant Magan and two of the NSS officers who would torture him were present. Defendant Magan falsely accused Plaintiff of being a member of the newly established USC, despite the fact that the USC was established in January of 1989, while Plaintiff was in detention. Plaintiff denied being a member of the USC. Defendant Magan told Plaintiff that if he did not confess to being a member of the USC, they would obtain his confession through torture.

37. On or about February 8, 1989, at midnight, two young non-commissioned officers came to Plaintiff's cell and told Plaintiff they were under the direct order of Defendant Magan. Plaintiff was blindfolded, but one side of the blindfold was tied loose enough for him to see. Plaintiff was then taken from his cell and brought outside where several interrogators were present. There, he was tortured.

38. His hands were tied together with cloths and then handcuffed. His feet were similarly tied together with cloths and then handcuffed. He was forced to sit down. His legs were pushed back over his head, exposing his genitals. His testicles were squeezed with iron instruments, causing him excruciating pain. A five liter container of water, sand and small stones was forced into his mouth, cutting off his air supply. He fainted. When he regained consciousness, he was beaten with sticks.

39. During this torture, Plaintiff was questioned about the USC by the same two NSS officers who had interrogated him every day since the beginning of his detention.

40. Because of the torture he endured, Plaintiff is still suffering from a severe hipbone distortion, making it painful for him to sit down for extended periods of time.

He also continues to suffer from an injury to his bladder, causing him to urinate frequently.  At night, he feels pain all over his body, suffers from urinary incontinence and cannot sleep well.  In addition to his physical ailments, he has recurrent nightmares about his torture.

*The Sham Trial*

41.   On or around the end of February 1989, Plaintiff was transferred from the NSS Prison to Central Prison.

42.   When Plaintiff was transferred to Central Prison, the Duty Officer of the Prison read to Plaintiff that he was charged with a violation of Article 19 (Law N.54, 1970), Authoring Subversive Material, which carried a death penalty sentence.  This was the first time that Plaintiff learned of any charge against him.

43.   One day before his trial, Plaintiff received a notice of the trial hearing and learned that the charge against him had been changed to a violation of Article 18 (Law N.54, 1970), Possession of Subversive Material, which carried a three to five year prison sentence or a fine of 15,000 Somali shillings.

44.   On or about March 8, 1989, after nearly four months of pre-trial detention, Plaintiff was brought before the National Security Court.  The trial lasted less than one hour.  He was not provided an attorney to represent him.

45.   During the trial, Plaintiff told the National Security Court that he had been tortured by NSS officers and that Defendant Magan had ordered his torture.

46.   The National Security Court convicted Plaintiff of violating Article 18 (Law N.54, 1970), Possession of Subversive Material, and fined him 15,000 Somali Shillings.  Plaintiff's friend paid the fine on his behalf and he was immediately released.

*Defendant Magan Claims to Be Above the Law*

47.   After his release, Plaintiff again returned to his law practice and his law professor position at Somali National University.

48. From approximately March 8, 1989 until July 14, 1989, NSS officers followed Plaintiff wherever he went and questioned his students about him.

49. From approximately March 8, 1989 until July 14, 1989, NSS officers under Defendant Magan's command also repeatedly went to Plaintiff's mother's home – where Plaintiff lived – when Plaintiff was not there.  Each time, his family was told that Magan wanted to see Plaintiff and was questioned about where he was and what he was doing.

50. Several months after his March 8, 1989 release, Plaintiff and Defendant Magan came across each other in the office of the Attorney General of the National Security Court when Defendant Magan walked into a meeting between Plaintiff and the Attorney General.  During that encounter, Defendant Magan said he was above the law.

*The July 1989 Crackdown*

51. On or about July 13, 1989, on the same night that the NSS arrested several other prominent figures and government critics in Mogadishu, Defendant Magan and several NSS officers under his command again went to Plaintiff's mother's home.  Defendant Magan and his men waited all night and until noon the following day for Plaintiff to return.

52. Plaintiff was away on business. When he returned to his mother's home the following evening, he learned that Magan and his men had come for him the night before and waited for him until noon.  Plaintiff's mother urged him to hide.

53. On July 14, 1989, Plaintiff went into hiding, where he remained until he fled Somalia to Kenya on or about the night of August 21, 1989.

*Exile*

54. Several months after fleeing Somalia, Plaintiff wrote to Amnesty's International Secretariat in London from Nairobi.  Amnesty helped Plaintiff enter Italy, where he was given a five year scholarship as an academic researcher at Pisa University.  After his scholarship expired, Plaintiff worked in the Rome courts for another five years.

55. When his Italian work contract expired, Plaintiff traveled to the United Kingdom and applied for political asylum on March 30, 2000.  He was granted Refugee Status in May 2000, and became a citizen of the United Kingdom in November 2005.

## GENERAL ALLEGATIONS

56. The acts described herein were carried out under actual or apparent authority or color of law of the government of Somalia.  Defendant Magan bears direct responsibility for his role in these acts, bears responsibility for conspiring with and/or aiding or abetting his subordinates to commit these acts, and bears command responsibility as Chief of NSS Investigations.

57. Plaintiff alleges that Defendant Magan is personally liable for acts of torture, arbitrary detention and cruel, inhuman or degrading treatment or punishment committed against Plaintiff by virtue of Defendant Magan's direct or indirect participation, including directing or ordering his subordinates in the NSS or persons or groups acting in coordination with the NSS or under their control, to commit these acts.

58. Plaintiff alleges that Defendant Magan is also liable because he conspired with, or aided and abetted subordinates in the NSS, or persons or groups acting in coordination with the NSS or under their control to commit acts of torture, arbitrary detention and cruel, inhuman or degrading treatment or punishment.  Defendant Magan substantially assisted and directed the parties who personally committed the abuses of Plaintiff.  He knew that his actions would facilitate these abuses at the time he provided the assistance and direction.  Defendant Magan is therefore also jointly and severally liable for the actions committed against Plaintiff by NSS officers under his command, all of which were undertaken as part of a common plan, design and scheme.

59. Plaintiff alleges that Defendant Magan is also liable because at all relevant times between 1988 and 1990, Defendant Magan, as Chief of NSS Investigations, possessed and exercised command and effective control over the NSS officers who participated in the arbitrary detention, torture and cruel, inhuman or degrading treatment

or punishment against Plaintiff. Defendant Magan's command over the NSS officers included the authority and responsibility to give orders to, set policies for and manage the affairs of officers under his control, and to appoint, remove and discipline such officers. He also acquiesced in, and permitted, groups acting in coordination with the NSS to commit human rights abuses.

60. Defendant Magan had the legal authority and practical ability to exert control over subordinates in the NSS, or persons or groups acting in coordination with the NSS, or under their control, who participated in the torture, arbitrary detention and cruel, inhuman or degrading treatment or punishment against Plaintiff described herein.

61. At all relevant times between 1988 and 1990, Defendant Magan, as Chief of NSS Investigations, had a duty under customary international law and multilateral treaties to ensure the protection of civilians, to prevent violations of international law by the NSS officers under his command, and to ensure that all persons under his command were trained in, and complied with, the laws of warfare and international law, including the prohibitions against torture, cruel, inhuman or degrading treatment or punishment, and arbitrary detention. Furthermore, Defendant Magan had a duty under customary international law and multilateral treaties to investigate, prevent and punish violations of international law committed by all persons under his command.

62. Defendant Magan failed or refused to take all necessary measures to investigate and prevent these abuses, or to punish persons under his command for committing such abuses.

63. The acts of torture; cruel, inhuman or degrading treatment or punishment; and arbitrary detention inflicted upon Plaintiff were part of a pattern and practice of systematic or widespread human rights violations against the civilian population of Somalia perceived as opponents of the Barre regime. At all relevant times, Defendant Magan knew or reasonably should have known of the pattern and practice of gross human rights abuses perpetrated against the civilian population perceived as opponents of the

Barre regime by subordinates under his command, including the abuses committed against Plaintiff.

### Equitable Tolling of the Statute of Limitations

64. Defendant Magan has resided in the United States only since in or around 2000. Before that time, neither this court, nor any other United States court, could exercise jurisdiction over Defendant Magan for claims relating to the actions described herein. For this reason, the statute of limitations for these claims was tolled until, at the earliest, 2000.

65. Alternatively, up through the present, victims of human rights abuses committed in the 1980s in Mogadishu by the NSS, or persons or groups acting in coordination with the NSS or under their control, could not have been expected to pursue a cause of action in the United States. Victims' reasonable fear of reprisals against themselves or members of their families still residing in Somalia has served as an insurmountable deterrent to such action. Gross and systematic human rights violations openly committed by rival clans had a further chilling effect. Also, up through the present, it has not been possible to safely conduct investigations and discovery in Somalia in support of such a case.

66. Throughout the 1990s, Somalia fell into increasing chaos. Following the violent defeat of the military government in 1991, Somalia's central government collapsed. Fighting among rival clan leaders resulted in the killing, displacement, and mass starvation of tens of thousands of Somali citizens. The ensuing chaos led the United Nations to intervene militarily in 1992, though it proved incapable of restoring even a minimum level of order. Somalia's clan-based civil war and anarchic violence proved to be so brutal that it drove the United Nations from the country in 1994. Rival clan militias continued to commit gross and systematic human rights abuses in the years after the United Nations' departure, including the deliberate killing and kidnapping of civilians because of their clan membership.

67. During these years, conditions in Somalia precluded human rights cases against former commanders of the Somali Armed Forces from being brought either in Somalia, the United States or elsewhere. Throughout the time period alleged in the complaint, and up until the present, Plaintiff has had immediate family still residing in Somalia. Pursuit of human rights claims – even in the United States – would have exposed victims and their families to acts of retribution, which discouraged victims from pursuing their claims. Witnesses also reasonably feared acts of reprisal for assisting in such cases.

68. The return of stability sufficient to permit victims of Barre-era human rights abuses to come forward has been a slow and uneven process. Stable conditions still do not exist in most regions of Somalia. In particular, the capital city of Mogadishu is still fraught with violence. As recently as April of 2010, intense fighting between hardline Islamist rebels and pro-government forces in Mogadishu continue to result in civilian casualties and the displacement of a large number of civilians. Clan allegiances are still very strong, violence is still a daily possibility, and fear of clan-based repercussions is still of paramount concern to Plaintiff.

**Absence of Remedies in Somalia**

69. Somalia remains without a functioning national government and national judicial system in which victims of Barre-era human rights abuses could bring their claims. Somalia still does not have a functioning court system capable of reviewing human rights abuses committed by the military government in the 1980s. The country remains under the de facto control of competing clan leaders, warlords and criminal gangs, many of whom commit or countenance the commission of serious human rights abuses. Accordingly, there were, and still are, no adequate and available remedies for Plaintiff to exhaust in Somalia.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Torture)

70. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 69 as if fully set forth herein.

71. The acts described herein constitute torture as defined by the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).  Additionally, these acts constitute "tort[s] … committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350, in that they were in violation of customary international law prohibiting torture as reflected, expressed, defined, and codified in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities.

72. The acts described herein were inflicted deliberately and intentionally upon Plaintiff for purposes that include, among others, intimidating or coercing him to confess to being a writer for Amnesty International, intimidating or coercing him to confess to being a member of the USC, discriminating against him for his presumed political beliefs, or discriminating against him for his membership in a specific ethnic group.

73. The torture of Plaintiff did not arise from, and was not inherent in or incidental to, lawful sanctions.

74. Defendant Magan exercised command responsibility over, or directed, ordered, conspired with, or aided and abetted subordinates in the NSS, or persons or groups acting in coordination with the NSS or under their control, to torture Plaintiff. Furthermore, Defendant Magan knew or should have known that his subordinates had committed, were committing, or were about to commit human rights abuses, and he failed to prevent the abuses or to punish those responsible.

75. Defendant Magan's acts or omissions described above and the acts committed by his subordinates against Plaintiff were committed under actual or apparent authority, or color of law, of the government of Somalia.

76. Defendant Magan's acts or omissions described above and the acts committed by his subordinates, caused the torture of Plaintiff and caused him to suffer, and continue to suffer from, severe physical and mental pain and suffering. This includes threatened infliction of severe physical pain or suffering, the threat of imminent death, and the resulting psychological damage that persists to this day.

77. As a result of his torture, Plaintiff is entitled to damages in an amount to be determined at trial.

78. Defendant Magan's acts were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### (Cruel, Inhuman or Degrading Treatment or Punishment)

79. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 69 as if fully set forth herein.

80. The acts described herein constitute "tort[s] … committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350, in that they were in violation of customary international law prohibiting cruel, inhuman or degrading treatment or punishment as reflected, expressed, defined, and codified in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities.

81. Defendant Magan exercised command responsibility over, or directed, ordered, conspired with or aided and abetted subordinates in the NSS, or persons or groups acting in coordination with the NSS or under their control, to inflict cruel, inhuman or degrading treatment or punishment upon Plaintiff. Furthermore, Defendant

16

Magan knew or should have known that his subordinates had committed, were committing, or were about to commit human rights abuses, and he failed to prevent the abuses or to punish those responsible.

82. The acts of cruel, inhuman or degrading treatment or punishment described herein had the intent and effect of inflicting severe or serious physical or mental pain or suffering upon Plaintiff.  As an intended result of these acts, Plaintiff suffered severe or serious physical or mental pain or suffering.

83. Defendant Magan's acts or omissions described above and the acts committed by his subordinates, caused the cruel, inhuman or degrading treatment or punishment of Plaintiff and caused him to suffer severe or serious physical or mental pain and suffering.

84. The cruel, inhuman or degrading treatment or punishment of Plaintiff did not arise from, and was not inherent in or incidental to, lawful sanctions.

85. Defendant Magan's acts or omissions described above and the acts committed by his subordinates against Plaintiff were committed under actual or apparent authority, or color of law, of the government of Somalia.

86. As a result of the cruel, inhuman or degrading treatment or punishment described above, Plaintiff is entitled to damages in an amount to be determined at trial.

87. Defendant Magan's acts were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF

**(Arbitrary Detention from on or about November 20, 1988 to March 8, 1989)**

88. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 69 as if fully set forth herein.

89. The arbitrary detention of Plaintiff described herein constitutes a "tort … committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350, in that it was in violation of customary international

law prohibiting arbitrary detention as reflected, expressed, defined, and codified in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities.

90. Plaintiff was detained without warrant, probable cause, or articulable suspicion and was sentenced by courts that failed to accord him due process protections.

91. Defendant Magan exercised command responsibility over or directed, ordered, conspired with or aided and abetted subordinates in the NSS, or persons or groups acting in coordination with the NSS or under their control, to arbitrarily detain Plaintiff. Furthermore, Defendant Magan knew or should have known that his subordinates had committed, were committing, or were about to commit human rights abuses, and he failed to prevent the abuses or to punish those responsible.

92. Defendant Magan's acts or omissions described above and the acts committed by his subordinates against Plaintiff were committed under actual or apparent authority, or color of law, of the government of Somalia.

93. As a result of his arbitrary detention as described above, Plaintiff is entitled to damages in an amount to be determined at trial.

94. Defendant Magan's acts were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the Defendant as follows:

1. For compensatory damages according to proof;

2. For punitive and exemplary damages according to proof;

3. For prejudgment interest as allowed by law;

4. For attorneys' fees and costs of suit according to proof; and,

5. For any such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

The plaintiff hereby demands a trial by jury.

Dated: <u>April 21, 2010</u>  ABUKAR HASSAN AHMED,

By Counsel

By: <u>s/Tiffany T. Smith</u>

Tiffany Smith, 85456
Trial Attorney
ttsmith@akingump.com
Mark J. MacDougall
Kristine L. Sendek-Smith
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
(202) 887-4000

Natasha E. Fain
Andrea C. Evans
Center for Justice & Accountability
870 Market Street, Suite 682
San Francisco, California 94102
(415) 544-0444