IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Abukar Hassan Ahmed, | : | |
|     Plaintiff | : | Civil Action 2:10-cv-00342 |
| v. | : | Judge Smith |
| Abdi Aden Magan, | : | Magistrate Judge Abel |
|     Defendant | : | |

# Report and Recommendation

Plaintiff Abukar Hassan Ahmed brings this action against defendant Abdi Aden Magan under the Alien Torture Statute ("ATS"), 28 U.S.C. § 1350 and the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350. On November 20, 2012, the Court granted plaintiff's motion for summary judgment on liability. (Doc. 100.) On January 16, 2013, Judge Smith referred this matter to the Magistrate Judge for a report and recommendation on the issue of damages. (Doc. 103.) A trial on damages was held before the Magistrate Judge May 30, 2013. Defendant Abdi Aden Magan was given notice of the trial (see, docs. 106 and 107, PageID 2331) but failed to appear. He has not defended this lawsuit since his counsel withdrew in December 2011. (Doc. 73.)

## I. Plaintiff Abukar Hassan Ahmed's Claims

The complaint alleged that defendant Abdi Aden Magan, a legal resident of the United States, is liable for plaintiff Ahmed's arbitrary detention in Somalia from November 20, 1988 to early March 1989, torture, and cruel, inhuman and degrading treatment

or punishment because he exercised command responsibility over, aided and abetted, and conspired with subordinates in the Somali National Security Service in accordance with a common plan to abuse the rights of perceived political opponents of the government of Somalia, and that plaintiff was arbitrarily detained, tortured, and subjected to cruel, inhuman or degrading treatment by subordinates of defendant or others acting in accordance with this common plan. On November 20, 2012, the Court granted plaintiff summary judgment on his claims: (1) that plaintiff was arbitrarily detained in violation of the ATS; (2) that he was tortured in violation of the ATS and TVPA; (3) that he suffered cruel, inhuman or degrading treatment or punishment in violation of the ATS; and (4) that defendant is liable for plaintiffs' arbitrary detention, torture, and cruel, inhuman or degrading treatment or punishment. (Doc. 100.)

**II. Preliminary Matter: Effect of *Kiobel v. Royal Dutch Petroleum Co.,* 133 S.Ct. 1659, 2013 WL 1628935 (April 17, 2013) on Ct's grant of summary judgment**

Plaintiff's counsel advised the Court of the recent United States Supreme Court decision in *Kiobel v. Royal Dutch Petroleum Co.,* 133 S.Ct. 1659, 2013 WL 1628935 (April 17, 2013). In that case the Supreme Court held that the presumption against extraterritoriality applies to claims under the Alien Torture Statute, 28 U.S.C. § 1350. Plaintiff argues that *Kiobel* is a narrow decision that does not bar plaintiff's claim here. First, plaintiff argues that *Kiobel* held that the issue was "not whether petitioners [had] stated a proper claim under the ATS, but whether a claim may reach conduct occurring in the territory of a foreign sovereign," *Kiobel,* 133 S.Ct. at 1664, and that consequently it is not a decision about subject matter jurisdiction but about what types of claims may be pleaded under the

statute. Defendant did not move to dismiss for failure to state a claim, and he did not oppose summary judgment. Any merits argument he might have had has been waived. Second, plaintiff contends that even if that argument is rejected, the presumption against extra-territoriality has been rebutted in this case because defendant Magan is a resident of the United States and the United States has an interest in not becoming a haven for persons who commit serious crimes actionable under the ATS.

I conclude that defendant has waived any merits argument he may have raised based on the *Kiobel* decision. I also find that as a permanent resident of the United States, the presumption of against extraterritoriality has been overcome in this case. The United States Department of State expressly stated its assessment that it is appropriate to give effect to the proposition that U.S. residents who enjoy the protections of U.S. law ordinarily should be subject to the jurisdiction of the courts. *See* doc. 45 at PageID#214.

**III. Findings of Fact**

<u>Ahmed's background, education, profession, and family</u>. Plaintiff Abukar Hassan Ahmed was born in 1946 in Mogadishu, Somali. His was from a well to do middle class family who were members of the Hawiye clan. Ahmed went to school in Mogadishu, then attended the University of Kiev in the Ukraine. In 1970, he began working for the Somalia Ministry of Foreign Affairs. In 1973, he became an adjunct professor at the Somalia International University. He taught international law and constitutional law. In 1974, Ahmed earned a masters degree in international law at the Hague, Netherlands. In 1978, he went to Pisa, Italy to study for a Ph.D., which he earned in 1980.

In Mogadishu, Ahmed was married and had two children, one of whom–his daughter–died in 1978. He is now divorced from his first wife but remarried.

In Mogadishu, Ahmed practiced law as a partner in a law firm. He defended persons appearing before the National Security Court, which was established by Law Number 54, Article 24 in 1970 to hear charges against the political opponents of Somalia's military regime. Plaintiff's Ex. 2. Most of the people he represented were his students and others were faculty at the University. Ahmed represented those charged before the National Security Court because he wanted to demonstrate to his students that political opinions are not crimes, and he wanted to teach them that political, social and economic rights are protected by international declarations and conventions.

National government of Somalia. On October 15, 1969, the first president of Somalia was killed by a policeman. The political leaders were unable to decide on a successor. On October 21, 1969, the military took power led by Mohamed Siad Barre. He ruled Somalia until 1991. Clan membership was important to Siad Barre's rule. There are four major clans in Somalia: Hawiye, Darod, Dir, and Isaac. Siad Barre's government relied on an alliance among members of three Darod sub-clans: Marehan (Siad Barre's); Ogden (his mother's); and Dolbahante (his principal son-in-law's).  The common acronym for this alliance of members from the three Darod sub-clans was M.O.D. Siad Barre's policies were always based on clan-ism. The Hawiye was the major clan in Mogadishu. It was the clan of the wealthy and the intelligentsia. The Siad Barre regime had a long history of torturing and imprisoning Hawiye intellectuals.

NSS and Somalia laws punishing political dissidents. Law Number 14, Article 1

4

established the National Security Service ("NSS"). Plaintiff's Ex. 1. It gave the NSS full power to arrest and detain without a warrant and to conduct warrantless searches. *Id.* Articles 4 and 6.

NSS officers were trained principally in East Germany and also in Cuba and the Soviet Union. Because of their training in East Germany, they were commonly referred to as the Black Gestapo.

The NSS was everywhere you went, including universities and schools. For example, members of the NSS were students in Ahmed's classes. The NSS had a reputation for torture and inhumane treatment of prisoners. They were responsible for the disappearances of dissidents. They operated maximum security prisons that held political prisoners for long periods of years.

<u>Ahmed's first imprisonment</u>. From January 1981 until March 1986, Ahmed was imprisoned without charge at the NSS detention facility in Mogadishu. He was not tortured during this imprisonment. After his release, Ahmed returned to practicing law and teaching law. He continued to defend political dissidents and others held by the NSS or charged with political crimes.

During this imprisonment, Amnesty International wrote letters to Somali authorities and to Somali diplomatic missions in Europe recognizing Ahmed as an objector of conscious who was arrested for his political opinion. But Ahmed remained incarcerated without charge or trial. He was released after 5 years and 3 months.

<u>Ahmed's second imprisonment, interrogation and torture</u>. Just before midnight on November 19, 1988, NSS officers came to Ahmed's house, handcuffed him, and took him

to the ruling party's prison. He was not read his rights or told the charges against him. When he was arrested, Ahmed had a copy of an Amnesty International report that he intended to give to a friend: "Somalia: A Long-Term Human Rights Crisis" (September 1988). Plaintiff's Ex. 3.

At the NSS's headquarters, Ahmed was placed in a small cell that had no ventilation and no windows. There was a one-inch slit on the door for observation. A light was on 24 hours a day. There was no mattress and no blankets. During the humid nights, Ahmed had to sleep on the cold, wet floor.

Throughout his incarceration, Ahmed's right wrist and left ankle were handcuffed together, making it difficult for him to comfortably sit, stand, walk, or sleep. One time each day the handcuffs were removed for Ahmed to go to the toilet, wash himself, and care for his other personal needs. If he was not done within five minutes, he was forced to lay down and roll in the sand. In his cell, there was a milk can that he could urinate in during the day. He also used it when his stomach problems caused him to throw up.

In the morning and again in the evening, Ahmed's right hand was uncuffed and his left hand cuffed so that he could eat. He was given one poor quality piece of bread and a cup of tea. During his more than three months' solitary confinement under these conditions, Ahmed became weak from starvation.

On February 7, 1989, Ahmed was taken by Captain Sufi Dherow and Lieutenant Mohammoud Farah Igal to the office of defendant Abdi Aden Magan. Magan greeted him, Oh, you are professor and everybody talks about you. We know you are a member of the Patriotic Front of Somali Unity and the USC (United Somali Congress). Ahmed said that

6

he had never heard of either.[1] But Magan responded that they knew he was a member and if he did not confess they would torture and kill him.

Ahmed told Magan again that he was not a member of either group and that if he did not believe him, he should take him to court. Magan responded that Ahmed talked too much. Then Magan, laughing and with a sarcastic smile, ordered Captain Dherow to "do his job" if Ahmed did not confess.

Ahmed was escorted back to his cell. Two or three hours later, the duty officer came and told him that he was going to be tortured on Magan's orders. He was blind-folded and taken to another location. His wrists were bound with cloth, then handcuffed.  A plastic cord was looped behind his neck and then tied to his big toes, which was very painful.

Ahmed was forced to sit down and they pushed his legs back over his head, exposing his genitals. The torturers squeezed his testicles with iron instruments. Ahmed fainted from the excruciating pain. When he regained consciousness, they forced a five liter container of water, sand and small stones into his mouth to cut off his air supply. Ahmed believed that he would suffocate and die. The officers beat his body with wooden sticks. One officers struck Ahmed on the top of the head with an AK-47. Throughout this ordeal, the torturers questioned Ahmed about his involvement with United Somali Congress and Amnesty International.

---

[1] The Patriotic Front of Somali Unity apparently was not and never was a political organization. The United Somali Congress was founded in Rome in January 1989–while Ahmed was in prison.

<u>Ahmed's injuries</u>. Since his incarceration and torture through the date of trial and as a proximate result of that incarceration and his torture, plaintiff Abukar Hassan Ahmed has suffered and continues to suffer from the following injuries, pain and suffering.  He has had and continues to have frequent nightmares. Sometimes he sees the cell he was held in. Sometimes he wets his bed. He has flashbacks of Magan sarcastically laughing at him with hatred on his face. He wakes up many times with pain and with nightmares. He has trouble with his leg after sleep.

He has experienced bladder pain ever since his torture. He takes both pain medication and bladder medication for the condition. He is unable to contain his urine especially well. He also has the frequent urge to urinate.

The torture affected his sexual function. He can no longer have children, and a woman left him because he could not have babies. He must take medication to have intercourse with his wife.

As a result of how he was shackled 24 hours a day for two and a half months, sitting is difficult for Ahmed. Especially at night, Ahmed experiences pain in his shoulders and back. He takes medication to relieve that pain. Ahmed developed a deep sore on his left ankle from the shackling. He has a scar on the top of his head from being struck with the AK-47.

Dr. Stuart Lustig, a psychiatrist with significant experience examining torture victims, examined Ahmed and diagnosed post traumatic stress disorder ("PTSD"). Nightmares are a symptom of PTSD. Ahmed told Dr. Lustig that he tried to avoid them by going to bed at one or two in the morning and getting up after about three hours sleep.

His memories and flashbacks interfere with his social life. He becomes acutely irritable when the NSS is brought up. It is unlikely that Ahmed's PTSD symptoms will ever abate.

Dr. Coleen Kivlahan, a family physician with about 12 years experience examining torture victims, examined Ahmed in March 2012. He has a 6 cm. healed laceration in the right temporal region and a bump next to it. There is a 3-4 cm., very contracted scar wound on his left foot that is consistent with abrasive trauma caused by metal handcuffs rubbing over the ankle over time. Ahmed also has swelling of his left leg, and there is evidence of insect bite scars. There are light scars just below his right thumb. There are several scars on his abdomen and back that could be from torture.

Ahmed suffers from sexual shame associated with the torture. His scrotum was swollen for at least one month after his release from detention. He experiences difficulty urinating and difficulty obtaining an erection. He is unable to father children. He has difficulty controlling his bladder, especially at night. Ahmed also experiences a feeling of wet asphyxiation.

Dr. Kivlahan testified that men identify sexual trauma with body parts. Ahmed has experienced chronic pain in his right shoulder, neck and back. He takes a narcotic pain killer and a strong non-steroidal pain killer. Physical therapy was not effective, which is typical of torture survivors.

<u>Trial</u>. On February 28, 1989, the prosecutor denied the NSS's request to continue Ahmed's detention. He was transferred to the Central Prison in Mogadishu. A few days later, Ahmed was taken to the prosecutor's office and met with a deputy prosecutor. Ahmed showed him his injuries from the torture and long solitary confinement with his

right hand and left leg handcuffed together.

The day before he was to go on trial, Ahmed was notified for the first time of the charge against him. He was told that the was charged with a violation of Law Number 54, Article 18, authoring anti-state propaganda (the Amnesty International report, "Somalia: A Long-Term Human Rights Crisis"). That charge was punishable by death. Plaintiff's Ex. 2, Law Number 54, Article 18. However, when Ahmed was taken to court the next day, the charge was possession of "seditious printed . . . material against the State" (the Amnesty International report), which was punishable by a term of 5 to 15 years incarceration or a fine of 5,000 to 15,000 Somali shillings or both. *Id.*, Article 19.

At trial, the prosecutor read the charge and said Ahmed possessed the Amnesty International report, a subversive document. He read parts of the report. Then the prosecutor said he left the decision to the court.

The judge asked Ahmed, who had asked to defend himself, if he had something to say. Ahmed respond that he did not deny having the report. He said that it was not a crime to possess the report, but that he did not know what the court would consider it. Ahmed also told the judge how many months he had been handcuffed, the conditions in his cell, his starvation, and that he had been tortured. He said that the deputy prosecutor had seen his injuries.

Without mentioning his torture, the judge found him guilty and fined Ahmed 15,000 schillings. His friend, Abdirazik Warsame, an ordinary prosecutor, paid the fine and Ahmed was released.

<u>Ahmed's life in Somalia after his March 1989 release from prison</u>. NSS men follow-

ed Ahmed everywhere he went. They contacted his students and family, threatening them, asking questions about how he behaved in class. Agents of the NSS were in his classes. Some students were members of the NSS.

Despite this intimidation, Ahmed continues always to defend political dissidents. One day he was in the office of Nur Hussein, a general prosecutor, discussing a case. Magan came in. Ahmed said, Magan, you are still following me. If you don't stop, I'll denounce you in court. Magan responded, I am the law. I am above the law.

On July 14, 1989, student dissidents rioted in Mogadishu against the regime. Many people were arrested, injured, and killed. Ahmed had a case 9 kilometers from Mogadishu. When he came home the next day, his mother said that the NSS had been waiting at his house for him the night before.

Ahmed left Mogadishu and hid for one month and seven days in Mr. Warsame's house. Another human rights lawyer, Mr. Gimali, was arrested, as well as Abdul Kadir Aden, a son of the former President, and many others the regime considered dissidents. Ahmed fled Somalia, disguised as an Islamic sheik. He feared that is the NSS caught him he'd be killed.

After fleeing Somalia. Ahmed stayed in Kenya for two years, then he lived in Italy. In 2000, he came to the United Kingdom. In 2005, Ahmed became a U.K. citizen.

Laws permitting the detention of political dissidents. Ahmed testified that Law Number 54, which created the National Security Court, was unconstitutional and illegal because it was enacted to suppress political dissidents in Somalia. Law Number 1 gave the regime the power to arrest or detain any Somali citizen without any warrant from a judge

11

or court. Habeas corpus was repealed from Article 55 of the criminal procedure law of Somalia.

## IV. Damages Under the ATS and TVPA

It is no easy task to quantify damages for human rights abuses because basic human rights are the bare minimum freedoms from arbitrary state action that permit individuals and those they are in community with to congregate, work together to improve the lives of each other and others subject to the state's authority, and use their talents, vigor and ideals to live flourishing lives as vital members of their community. When those basic human rights are trammeled by the state's brute force, the victim is stripped of his dignity and prevented from exercising these precious human and political rights. The loss is incommensurable. The victim's trust that his country will always recognize his worth and protect him from cruel, arbitrary degradation and injury is crushed. Perhaps worse, the fragile faith judges, lawyers, police, military and government officials must have in the state's commitment to human rights is undermined, if not destroyed, and their willingness–and courage–to protect those rights is undermined–given the frailties of our common human nature–perhaps irrevocably.

Courts typically consider a number of factors in awarding damages under the ATS and TVPA: (1) the brutality of the act; (2) the egregiousness of the defendant's conduct; (3) the unavailability of a criminal remedy; (4) international condemnation of the act; (5) deterrence of others from committing similar acts; and (6) provision of redress to plaintiff, country, and world. *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1158 (E.D. Cal. 2004).

Here, defendant's conduct was brutal and egregious. Plaintiff was detained for over

three months without notice of the charges against him. He was not permitted to communicate with his family and friends Plaintiff experienced severe physical and mental pain and suffering, which was intentionally inflicted upon him. The uncontroverted evidence demonstrates that NSS officers squeezed his testicles with iron instruments and forced a five liter container of water, sand and small stones into his mouth to cut of his air supply. Plaintiff continues to suffer from nightmares and post traumatic stress disorder. He also continues to experience pain, bladder problems, and sexual dysfunction as a result of his injuries.

There was no criminal remedy for defendant's actions. The international community condemned the actions of the Somalia government. In order to deter others from committing such acts and to provide redress to plaintiff, the Magistrate Judge RECOMMENDS that plaintiff be AWARDED $5,000,000 in compensatory damages and $10,000,000 in punitive damages.

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-152 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *United States v.*

*Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005); *Miller v. Currie,* 50 F.3d 373, 380 (6th Cir. 1995). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir. 1991).

s/Mark R. Abel  
United States Magistrate Judge
